UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 1:16-cr-228 |
| v. | Count 1: 18 U.S.C. § 371<br>Conspiracy |
| RUSLANS BONDARS, | Count 2: 18 U.S.C. § 1349<br>Conspiracy to Commit Wire Fraud |
| a/k/a, "Ruslan Bondar," | Count 3: 18 U.S.C. §§ 1343 & 2<br>Wire Fraud & Aiding and Abetting |
| Defendant | Count 4: 18 U.S.C. §§ 2 & 1030(a)(5)(A)<br>Computer Intrusion With Intent to Damage &<br>Aiding and Abetting |
| | Notice of Forfeiture |
| | **UNDER SEAL** |

## SUPERSEDING INDICTMENT

April 2018 Term — at Alexandria, Virginia

## Introduction

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment:

1. Defendant RUSLANS BONDARS was a permanent resident of Latvia who resided in Riga, Latvia. BONDARS sometimes went by the first name Ruslan and the last name Bondar.

2. Jurijs Martisevs ("MARTIŠEVS") was a citizen of Latvia who resided in Riga, Latvia and Moscow, Russia. MARTIŠEVS sometimes went by the last names "Martyshev" and "Bereverovs." MARTIŠEVS sometimes went by the first name "Yury."

1

3.     Amazon Web Services operated servers in the Eastern District of Virginia upon which it offered cloud storage services.

4.     ICQ was an instant messaging service that employed servers located within the Eastern District of Virginia.

5.     The above introductory allegations are realleged and incorporated in each count of this Indictment as though fully set out in each count.

## COUNT 1
18 U.S.C. § 371
(Conspiracy)

THE GRAND JURY FURTHER CHARGES THAT:

6.     From at least on or about 2009, and continuing until at least October 12, 2016, in the Eastern District of Virginia and elsewhere, the Defendant, RUSLANS BONDARS, knowingly and intentionally conspired and agreed with MARTIŠEVS  and with other conspirators known and unknown to the Grand Jury to commit offenses against the United States, that is:

a.     to intentionally access a computer without authorization and exceed authorized access, and thereby obtain information from any protected computer, for purposes of commercial advantage and private financial gain, and to aid and abet the same, in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and (c)(2)(B)(i) and 2;

b.     to knowingly and with intent to defraud access a protected computer without authorization and exceed authorized access, and by means of such conduct further the intended fraud and obtain anything of value, and to aid and abet the same, in violation of Title 18, United States Code, Sections 1030(a)(4) and 2; and

2

c.      to knowingly cause the transmission of a program, information, code, and

command, and as a result of such conduct, intentionally cause damage without

authorization to 10 or more protected computers during any one year period, and to aid

and abet the same, in violation of Title 18, United States Code, Sections 1030(a)(5)(A)

and (c)(4)(A)(i)(VI) and 2.

### Manner and Means of the Conspiracy

It was part of the conspiracy that:

7.      BONDARS and MARTIŠEVS agreed, combined, and worked together with each

other and others, known and unknown to the grand jury, to operate an online service called

████████

8.      ████, a counter antivirus service, provides information that computer hackers

can use to determine whether the computer viruses and other malware they create will be

detected by antivirus software, including and especially antivirus software used by the computer

systems of major United States retailers, financial institutions, government agencies, and other

high-value targets. The purpose of ████, and the intent of BONDARS and MARTIŠEVS

BONDARS and MARTIŠEVS in operating the service, was to allow computer hackers to

develop malware, in particular, to make changes to their malware so as to reduce the chances that

the malware will be detected by the antivirus applications and services of the companies and

institutions they target.

9.      ████ is one of the largest services of its kind and had at least 30,000 users.

Malware that has been submitted to ████ includes some of the most prolific malware known

to the Federal Bureau of Investigation (FBI) and has been used in major computer intrusions

committed against American businesses.  At all relevant times, BONDARS and MARTIŠEVS

knew that ████ was being used to further such computer intrusions and the resulting fraud

3

and acted with the purpose of aiding such crimes and with the intention of causing such crimes to occur.

10.   The malware submitted to █████ includes, but is not limited to, the following:

   a.  **"Crypters"**: software used to hide malicious files from antivirus software so that the software cannot detect and quarantine the malicious files;

   b.  **"Remote Access Trojans"**: software that allows a remote "operator" to control a system as if he or she has physical access to that system, including the possibility of administrator-level privileges;

   c.  **"Keyloggers"**: surveillance software that has the capability to record keystrokes entered on the victim computer and send that information to the user of the keylogger. A keylogger can record and steal any information typed on a keyboard, including sensitive information such as emails, instant messages, and passwords to email, social media, and financial accounts; and

   d.  **"Malware Tool Kits"**: toolkits specifically designed for users to create customized malicious files with functions of user preference. Some of the toolkits have embedded █████ Application Program Interface (API) in order to determine if the created malicious files were detected by antivirus software. Typically, if the malicious files were detected by antivirus software, users would change the digital signature of the malicious files and rescan the malicious files using the █████ service with the goal of making the malicious files fully undetectable by antivirus software.

11.   BONDARS and MARTIŠEVS intentionally marketed █████ to computer hackers using the website █████.net and a hidden service accessible via The Onion Router

(TOR), an online network for enabling anonymity. BONDARS and MARTIŠEVS also advertised

███████ on underground online cybercrime forums, which are support networks used by

individuals worldwide to buy, sell, and rent malware kits, botnets, and stolen personal identifying

information (PII).  Moreover, the █████ service differed from legitimate scanning services in

multiple ways.  For example, while legitimate scanning services share data about uploaded files

with the antivirus community, and notify their users that they will do so, █████ instead

informed its users that they could upload anonymously, and that data about uploaded files would

not be shared with the antivirus community.  As a result, BONDARS and MARTIŠEVS knew

and intended that the █████ service would be used for facilitation of online criminal activity.

12.    BONDARS and MARTIŠEVS were leaders of the conspiracy and played the

following roles, among others:

    a.  RUSLANS BONDARS served as an administrator of █████.

        BONDARS'S responsibilities in the conspiracy included, among other things,

        maintaining the technical infrastructure used for the █████ service and

        website;

    b.  JURIJS MARTIŠEVS also served as an administrator of █████.

        MARTIŠEVS'S responsibilities in the conspiracy included, among other

        things, providing customer support to █████'s customers, typically via

        email, ICQ, Jabber, and Skype.

### Overt Acts

In furtherance of the conspiracy and its objects, the following overt acts, among others,

were committed in the Eastern District of Virginia and elsewhere by members of the conspiracy:

13.    One of BONDARS and MARTIŠEVS' co-conspirators, Z.S., was a malware

developer who operated, in part, from Great Falls, Virginia, within the Eastern District of

Virginia. Z.S. designed a keylogger that he sold to over 3,000 customers, who in turn infected over 16,000 computers and thereby stole information, such as passwords, from those computers. On or about November 18, 2012, Z.S., using a computer in the Eastern District of Virginia, caused a payment to be made to an account controlled by BONDARS and MARTIŠEVS.

14.    In exchange for this payment and others, BONDARS and MARTIŠEVS provided Z.S. with access to █████ and allowed Z.S. to integrate the █████ API tool directly into his keylogger toolkit. The integration of the █████ tool into Z.S's keylogger allowed Z.S.'s customers to scan the keylogger's executable file to determine if the executable file would be detected by antivirus companies. If the executable was detected, the user could change the file's digital signature and rescan the executable, with the goal of making the malware fully undetectable by antivirus software.

15.    On or about November 18, 2012 through on or about November 23, 2012, Z.S., using a computer located in the Eastern District of Virginia, and MARTIŠEVS exchanged emails regarding Z.S.'s access to the █████ service.

16.    Beginning at least on or around October 28, 2009, and continuing through on or about October 12, 2016, MARTIŠEVS communicated with customers and potential customers of █████ via ICQ, an instant messaging system, in order to provide customer support and discuss the benefits and terms of █████ membership. At all relevant times, ICQ employed servers within the Eastern District of Virginia. Accordingly, MARTIŠEVS'S ICQ messages, which were sent in furtherance of the conspiracy, involved a wire signal being sent into, and typically out of, the Eastern District of Virginia.

17.    On or about February 1, 2013, through on or about July 15, 2014, BONDARS accessed the █████ service and site and performed administrative functions in furtherance of

the conspiracy while logged into cloud storage space that was controlled by the conspiracy and hosted on servers owned by Amazon Web Services within the Eastern District of Virginia. In order to access the ███████ service and site from outside the United States through the Amazon cloud storage, BONDARS caused wire signals to be transmitted both into and out of the Eastern District of Virginia.

(All in violation of Title 18, United States Code, Section 371.)

## COUNT 2
### 18 U.S.C. § 1349
### (Conspiracy to Commit Wire Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

18.    The factual allegations contained in paragraphs 1 through 17 are realleged and incorporated by reference herein.

19.    From at least on or about 2009, and continuing until at least October 12, 2016, in the Eastern District of Virginia and elsewhere, the Defendant, RUSLANS BONDARS, knowingly and intentionally conspired and agreed with MARTIŠEVS and with other conspirators known and unknown to the Grand Jury to commit and to aid and abet Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2, that is, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, and to aid and abet the same.

20.    At all relevant times, BONDARS and MARTIŠEVS acted with the intent to defraud.

### Manner and Means of the Conspiracy

It was part of the conspiracy that:

21.    As specified in more detail above, BONDARS and MARTIŠEVS agreed, combined, and worked together with each other and others, known and unknown to the grand jury, to operate an online service called ███████

22.     BONDARS and MARTIŠEVS' chief purpose in operating the ▮▮▮ service was to enable and cause fraud to be committed by and through co-conspirators who were ▮▮▮ members and by their co-conspirators, accomplices, and agents. BONDARS and MARTIŠEVS knew that their customers were using ▮▮▮ for the purpose of furthering fraudulent schemes that were furthered by interstate and foreign wire signals and acted with the purposes of furthering these fraudulent schemes. Specifically, the Defendant's chief purpose in operating the ▮▮▮ service was to help develop malware that could be used to gain unauthorized access to computer systems through false representations and thereby steal information, including sensitive financial and personal identifying information that could then be used to commit fraud.

### Overt Acts

23.     The overt acts specified in paragraphs 13 through 17 above were also committed in furtherance of the Wire Fraud conspiracy alleged in the instant count.

24.     In addition, malware that was developed by BONDARS and MARTIŠEVS' co-conspirators, who were ▮▮▮ members located in the Eastern District of Virginia and elsewhere, with the assistance of MARTIŠEVS, BONDARS, and the ▮▮▮ service, was used to perpetrate computer intrusions within the Eastern District of Virginia and elsewhere. The purpose of these computer intrusions was to steal information, including financial and personal identifying information, that could be used to commit fraud, and transfer that information via the internet across state and national lines to servers controlled by members of the conspiracy and their accomplices.

(All in violation of Title 18, United States Code, Section 1349.)

## COUNT 3
18 U.S.C. §§ 1343 and 2
(Wire Fraud and Aiding and Abetting)

THE GRAND JURY FURTHER CHARGES THAT:

25.     The factual allegations contained in paragraphs 1 through 24 are realleged and
incorporated by reference herein.

26.     From at least on or about 2009, and continuing until at least October 12, 2016, in
the Eastern District of Virginia and elsewhere, the Defendant, RUSLANS BONDARS, having
devised and intending to devise a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses, representations, and promises, transmitted
and caused to be transmitted by means of wire, radio, and television communication in interstate
and foreign commerce, any writings, signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343. At
all relevant times, BONDARS and MARTIŠEVS acted with the intent to defraud.

27.     In particular, as specified above, BONDARS and MARTIŠEVS operated the
████████ service for the purpose of gaining access to computers through false representations
and through that access stealing information, including but not limited to financial and personal
identifying information such as credit card, social security numbers, and dates of birth, and for
the purpose of using that fraudulently obtained information for, among other purposes, making
fraudulent purchases and fraudulent withdrawals and transfers of funds.

28.     In addition to committing Wire Fraud themselves, BONDARS and MARTIŠEVS
also knowingly and intentionally aided and abetted Wire Fraud committed by ████████'s
customers and their accomplices. At all times, BONDARS and MARTIŠEVS knew that their
customers were using their service for the purpose of furthering fraudulent schemes that were

executed by interstate and foreign wire signals and committed the acts specified in this indictment for the purposes of furthering the fraudulent schemes of their customers and their accomplices and co-schemers and with the intention of causing them to be committed.

  29.  Specifically, as specified in paragraph 24, BONDARS and MARTIŠEVS provided the ▨▨▨▨ service to accomplices and co-schemers in the Eastern District of Virginia and elsewhere, knowing that it would be used to develop malware to access computer systems by means of false representations and thereby steal information from those computer systems located in the Eastern District of Virginia and elsewhere, including sensitive financial information, and for the purpose of using the stolen information to commit fraud. BONDARS and MARTIŠEVS at all times knew that the ▨▨▨▨ service was being used to further such fraudulent schemes and acted for the purpose of furthering these crimes and causing them to be committed.

  (All in violation of Title 18, United States Code, Sections 1343 and 2.)

## COUNT 4
18 U.S.C. §§ 1030(a)(5)(A) and 2
(Computer Intrusion with Intent to Cause Damage and Aiding and Abetting)

30.   The factual allegations contained in paragraphs 1 through 29 are realleged and incorporated by reference herein.

31.   On or about October 15, 2012 through on or about December 2014, within the Eastern District of Virginia and elsewhere, the Defendant, RUSLAN BONDARS, knowingly and intentionally aided and abetted computer intrusions with the intent to cause damage, in violation of 18 U.S.C. § 1030(a)(5)(A).

32.   In particular, BONDARS, acting by and through his co-conspirator and agent MARTIŠEVS, sold access to the ▮▮▮▮▮ service to Z.S., a malware developer located in the Eastern District of Virginia, knowing that Z.S. intended to use ▮▮▮▮▮ to develop malware which would be used to knowingly cause the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause damage without authorization to 10 or more protected computers during any one year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and (c)(4)(A)(i)(VI).

33.   On or about November 18, 2012, with this knowledge, and with the intent and purpose of aiding such unlawful computer intrusions and causing them to be committed, BONDARS and MARTIŠEVS provided Z.S. with access to the ▮▮▮▮▮ service.

34.   Z.S. then used ▮▮▮▮▮ to help shield his malware from detection by antivirus software and to offer his customers the ability to use the ▮▮▮▮▮ service themselves to help avoid detection from the antivirus software of the victim computers they targeted. With the aid of the ▮▮▮▮▮ service provided by BONDARS and MARTIŠEVS, Z.S. sold his malware to over 3,000 customers who in turn accessed over 16,000 computers without authorization and thereby

12

intentionally damaged at least 10 protected computers during any one year period by changing their functioning such that those computers recorded sensitive information such as account passwords and sent that information to the users of Z.S.'s keylogger without the authorization of the owners of the victim computers.

     (All in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and 2.)

## NOTICE OF FORFEITURE

18 U.S.C. §§ 981, 2323; and 28 U.S.C. § 2461

THE GRAND JURY HEREBY FINDS THAT:

35.    There is probable cause that the property described in this NOTICE OF

FORFEITURE is subject to forfeiture pursuant to the statutes described herein.

36.    Pursuant to Federal Rule of Criminal Procedure 32.2(a), the United States of

America gives notice to the Defendant, RUSLANS BONDARS, that in the event of his

conviction of any of the offenses charged in this Superseding Indictment, the United States

intends to forfeit his property as further described in this NOTICE OF FORFEITURE.

37.    Upon conviction of any of the accounts alleged in the Superseding Indictment, the

Defendant, RUSLANS BONDARS, shall forfeit to the United States of America any property,

real or personal, which constitutes or is derived from proceeds traceable to the violation,

pursuant to 18 U.S.C. § 981(a)(1)(C) and (D)(vi), and 28 U.S.C. § 2461(c).

### MONEY JUDGMENT

38.    The United States of America gives notice to the Defendant, RUSLANS

BONDARS, that upon conviction, a money judgment may be imposed equal to the total value of

the property subject to forfeiture, which is at least $125,769.87.

### PROPERTY SUBJECT TO FORFEITURE

39.    The United States of America gives notice to the Defendant, RUSLANS

BONDARS, that the property to be forfeited includes, but is not limited to:

> a.  PayPal account under the name ▮▮▮▮▮▮ with account number ending in 5280;
> b.  Liberty Reserve account under the name "Jurijs," with account number ending in 0140;
> c.  WebMoney account under the name Jurijs Martisevs, with identification number ending in 8563;

    d.   Swedbank account, with Swift-Code HABALV22, and account number ending in 0608.

## SUBSTITUTE ASSETS

40.    If any of the property described above, as a result of any act or omission of

the Defendant, RUSLANS BONDARS,

    a.    cannot be located upon the exercise of due diligence;
    b.    has been transferred or sold to, or deposited with, a third party;
    c.    has been placed beyond the jurisdiction of the court;
    d.    has been substantially diminished in value; or
    e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to and intends to seek forfeiture of substitute

property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 2323(b)(2)(A) and

28 U.S.C. § 2461(c).

    (All pursuant to 18 U.S.C. §§ 981, 2323; and 28 U.S.C. § 2461.)

A TRUE BILL:

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
Foreperson
United States Grand Jury

Respectfully submitted,

Tracy Doherty-McCormick
Acting United States Attorney

By: _____
Kellen S. Dwyer
Laura Fong
Assistant U.S. Attorneys

C. Alden Pelker
Trial Attorney
Computer Crime and Intellectual Property Section
U.S. Department of Justice, Criminal Division