IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RUSLANS BONDARS,<br><br>Defendant. | CRIMINAL NO.: 1:16-CR-228<br><br>Hon. Liam O'Grady<br><br>Sentencing: September 20, 2018 |

**POSITION OF THE UNITED STATES ON SENTENCING**

The defendant made a business out of helping computer hackers. Using his considerable technical skill, he hijacked the services of every major antivirus company and provided those services to the hackers themselves so that they could test the detectability of their malware without the antivirus companies having the chance to observe, and protect against, these malicious products. After creating this service for hackers, the defendant then marketed it to hackers by placing paid advertisements on criminal hacking forums. As a consequence of these deliberate actions, the defendant's service, called "Scan4you," earned the trust of the criminal hacking community and attracted thousands of hackers as clients. The defendant himself acknowledged the criminality of Scan4you's user base, once telling his business partner that "all our reasonably savvy customers use VPN," a tool that obscures users' true IP addresses, "and do not provide their real email addresses."

Scan4you enabled and assisted computer hacking on a massive scale. The defendant created an Application Program Interface (API) that could be easily integrated

into malware toolkits. Several malware developers did just that: Scan4you's API was integrated into the Citadel Banking Trojan, a notorious malware toolkit that infected **33 million computers**, as well as the Limitless Keylogger that infected **16,000 computers**. And some of the malware used in one of the largest data breaches in U.S. history—the Target data breach that compromised over **39 million credit and debit cards**—was tested with Scan4you just ten minutes before being deployed against Target. These are just three examples of the thousands of hackers who used Scan4you for its intended purpose.

Scan4you may have been the defendant's most destructive criminal venture, but it was hardly his only. The defendant's criminal career dates back until **at least 2007** and would still be continuing today if not for hard work of the FBI and the Latvian National Police. The defendant's criminal history reflects a troubling combination of sophistication, innovation, and amorality. Over more than a decade, the defendant created viruses, crypted malware, redirected web traffic to malicious sites, wrote scripts that scoured the web for websites' vulnerabilities, hacked tens of thousands of computers, utilized a banking trojan that targets financial information, developed algorithms to support ransomware, and deployed malware to steal the computer processing power of infected computers. The defendant's sophistication and lack of remorse, combined with the lack of supervision he will receive after his release, make him a serious ongoing threat to the data security of every American.

The probation officer correctly calculated the guidelines as **420 months' imprisonment**. The government respectfully submits that such a sentence is necessary to protect the public from a sophisticated and unrepentant hacker, to reflect the immense harm caused by Scan4you, and to send a message that the United States will not distinguish between the hackers who attack

American businesses and computer networks and those who provide the infrastructure necessary for those attacks to succeed.

## I. Offenses of Conviction

### A. The Defendant Designed Scan4you for Hackers and Marketed It Specifically To Hackers.

At trial, the government offered the defendant's own electronic chats, as well as testimony from his co-conspirator, Jurijs Martisevs, showing that the defendant was himself a computer hacker and had originally designed what would become Scan4you to assist with his own computer hacking. *See* Government Exhibit ("GX") 32, at 10, 25; Trial Tr. 720 (Martisevs testimony). When the defendant and Martisevs realized that they could make money selling their service to other hackers, Scan4you was born. Trial Tr. 720.

While Scan4you began as an innovation, the use of Scan4you (or other services that were like it, and probably copied it) soon became a necessity for any reasonably sophisticated hacker. At trial, FBI cybercrime expert James Cowardin explained that malware developers "need to … test [their malware] to see if it will be able to run on systems that are protected by … antivirus …. Testing it … for the majority of malware, would including running it through a counter-antivirus service." Trial Tr. at 47-49. Former FBI Special Agent and cybersecurity expert Mark Ray agreed, calling the use of a counter-antivirus service an "essential step" in malware development and adding that antivirus detection is "something you have to stay on top of as a cybercriminal daily." *Id*. at 170-71, 174. Convicted hacker Dmitry Belorossov probably put it best when he explained that

> [y]ou always use a scanning service because you need to make sure that your executable file is clean and undetectable …. If you didn't scan your file, you have no way of knowing if this file is clean or not. So if your file will not be clean, it will cause antiviruses to catch the file, ***and you will never infect nobody***.

*Id.* at 241 (emphasis added); *see also id.* at 117, 124 (Shames testimony) (noting the importance of making malware undetectable and explaining that he would use Scan4you "every time to make sure that it wasn't detectable by any antiviruses.").

In order to attract hacker-clients to Scan4you, the defendant and Martisevs advertised Scan4you exclusively on online forums that they knew were dedicated to criminal hacking, and repeatedly promised customers that Scan4you would not share their malware samples with the antivirus community. *See* GX 113 and 128 (examples of Scan4you ads on hacking forums); GX 32 at 27 (chats regarding ads on hacking forums). The defendant was well-aware of how important noncooperation with antivirus companies was to his business model, remarking that if Scan4you is required "to provide signatures to AV companies[,] clients will find out about it in about a month and [our] service will go down on its own in 2-3 months." GX 12, at 5.

Scan4you further communicated its support for computer hacking to potential clients by advertising malware, such as ransomware, on its website. *See* GX 46 (ransomware ad on Scan4you). And the defendant himself designed and advertised a function of Scan4you that allowed users to check a type of malware called an "exploit pack." GX 44, at 17 (screenshot of Scan4you website advertising "Exploit Pack" checks); Trial Tr. 44 (expert testimony of Cowardin) (exploits are "malware … designed in order to exploit … a specific vulnerability in software" and "[e]xploit kits are a collection of these exploits").

By his own admission, the defendant was the technical brains behind Scan4you. *See* GX 1, GX 3. He created and maintained Scan4you's technical infrastructure, set up its servers, and created the API that allowed malware developers to integrate Scan4you directly into malware toolkits. *Id.* In setting up Scan4you's servers, the defendant used a variety of "proxy servers," apparently designed to hide the true location of Scan4you's backend servers. *See* FBI Forensic

Report, US-328-35, 339-42. In addition, the defendant created a Scan4you site on the Tor network (colloquially referred to as the "Dark Web") in order to allow customers to access it anonymously. GX 3, at 3. Most importantly, it was the defendant who was able to figure out a way to check malware against the databases of antivirus companies without simultaneously providing the antivirus companies with information about the viruses being checked. As demonstrated by cooperator testimony at trial, it was this innovation that made Scan4you so attractive to hackers. *See* Trial Tr. 126 (Shames testimony); Trial Tr. 210-211 (Vartanyan testimony); Trial Tr. 246-47 (Belorossov testimony).

### B. Scan4you's Membership Was Exactly as the Defendant Intended: Primarily, if not Exclusively, Criminal.

Unsurprisingly, the defendant's repeated promises not to cooperate with antivirus companies and his extensive and exclusive advertisements on hacking forums earned Scan4you a reputation as the world's premier criminal counter-antivirus service. Indeed, on April 5, 2010, Brian Krebs, who is extremely well known within the cybersecurity industry, published an article called "Virus Scanner for Virus Authors," which outed Scan4you as the criminal alternative to free and legitimate sites like VirusTotal.[1] Krebs noted that, while one similar service existed at the

[1] *See* Brian Krebs, *Virus Scanners for Virus Authors, Part II*, Krebs on Security (April 5, 2010) https://krebsonsecurity.com/2010/04/virus-scanners-for-virus-authors-part-ii/ ("While virus writers probably would love to use such services [as VirusTotal] to fine-tune the stealth of their malware, they may not want their unique malware samples broadly shared among the anti-virus community before the malware has even had a chance to infect PCs. So it's not hard to see why some malware authors and purveyors choose to avoid these free services in favor of subscription products that scan submitted files with multiple anti-virus engines, yet prevent those results from being shared with the anti-virus vendors. ***Such is the business model behind scan4you.net*** …. For 15 cents, you can scan your file to see if any potential victim's anti-virus program will detect it.") (emphasis added). The defendants' themselves were quite aware of this article. *See* GX 32, at 34 (chat in which Martisevs tells Bondars that a security blogger "just might write an article [about Scan4you] in one of the blogs. ***Just like Krebs was writing about us***.") (emphasis added).

time, it had fewer features and tested against fewer antivirus products than Scan4you. Throughout the next seven years, various other cybersecurity publications would report on the criminal nature of Scan4you.[2] At trial, several cybersecurity experts testified that they have been aware of the criminal nature of Scan4you for years.[3] Similarly, antivirus companies have long been aware that Scan4you was misusing their services without permission and for a criminal purpose and had consequently launched their own investigations into Scan4you. *See* Trial Tr. at 629-30 (Trend Micro witness) (testifying that Scan4you did not have permission to resell Trend Micro's service); *id* at 793-96 (Symantec witness) (testifying that Scan4you did not have permission to resell Symantec's service); GX 146 (Trend Micro user agreement prohibiting unauthorized reselling).

Just as the cybersecurity professionals knew Scan4you was a criminal service, so did criminals. Zachary Shames, for instance, testified that he learned of Scan4you through its advertisements on HackForums and used Scan4you because of their promise not to report to antivirus companies. Trial Tr. at 125-26. When asked why he trusted Scan4you's promise not to cooperate with antivirus companies, Shames cited Scan4you's reputation among hackers on

[2] *See, e.g.*, *Criminal Services – Counter Antivirus Services*, Digital Shadows (Nov. 30, 2015) (introduced at trial as GX 22) ("So-called 'Counter-AV' (CAV) services, sometimes referred to as 'multi AV scanners' or 'anonymous scanners' by the criminals themselves, offer an anonymous way for malware developers and malware users to test the stealth of their infected files … ***Perhaps the best known of the services is Scan4you***.") (emphasis added); *Bredolab Takedown Just the Tip of the Iceberg*, RSA (Aug. 22, 2012) ("Scan4you.net is essentially a 'criminal virustotal plus.' That is, it is a service where a miscreant can submit a newly created malware binary to gauge the detection rate of various antivirus vendors."); *Online Virus Scanners for Virus Authors*, The H Security (Apr. 6, 2010) ("Unlike other online services, such as VirusTotal, scan4you.biz and AVcheck.ru help aid malware authors and purveyors.").

[3] Trial Tr. at 49 (expert testimony of Cowardin) (explaining that counter-antivirus services are "cybercriminal services" used to "test … malware"); *id.* at 15-1564, 163, 165-66 (expert testimony of Mark Ray) ("I was familiar with Scan4you and other [services] … I considered to be counter-AV services" since around the time of his investigation of the SpyEye banking trojan, which began in 2010).

HackForums. *See* Trial Tr. at 126. In an instructional video posted on YouTube, Shames touted his integrated Scan4you feature and strongly admonished clients to use Scan4you rather than VirusTotal. *See* GX 190 (Shames's Instructional Video). When asked why it was so important to him to make sure none of his clients used VirusTotal, Shames explained that "if you scan on VirusTotal, then the files would get detected faster." Trial Tr. at 129. Mark Vartanyan and Dmitry Belorossov similarly attested to Scan4you's stellar reputation among criminals. *See* Trial Tr. at 212 (Vartanyan testimony) (regarding "Scan4you[,] … people would assume that you can trust it with your underground activity"); Tr. at 244, 246 (Belorossov testimony) (stating that he first saw ads for Scan4you on the website "FuckAV" and explaining that the "advertising point of Scan4you" is that "it does not report to AV companies" and that this was important to criminals because "if scanning service sends files to AV companies, … [t]hey will add this filing to their signature databases, so the file will get detected very quickly"). Scan4you was ultimately rated the best counter-antivirus on the web by a notorious Russian hacking forum called FuckAV.ru—a fact that reportedly pleased the defendant. *See* Trial Tr. 730 (Martisevs testimony).

No one knew the criminal reputation of Scan4you better than the defendants themselves. As Martisevs testified at trial, "Scan4you helped ***in most cases***, helped virus creators …. Scan4you customers would check their viruses many times. They would do modifications to their viruses until their viruses are not detected by antiviruses." Trial. Tr. 722 (emphasis added); *id.* at 724 (Martisevs testified that he understood that the Scan4you API was being integrated into malware toolkits). These statements were grounded in reality: Martisevs interacted directly with Scan4you members, many of whom made little effort to disguise their malicious intentions. *See, e.g.*, GX 89 (Scan4you user tells Martisevs "I'm building a crypter and wish to use your API"); 95 (Martisevs corresponds with Scan4you user who used the name and email address "underground

hacker"). And, while defense counsel insists that there is no evidence that Scan4you had more than three or four criminal clients, the defendant himself expressed a different view in a discussion with Martisevs about sharing Scan4you client information with the Russian Federal Security Service ("FSB"). The defendant indicated that it was okay to share client IP and email addresses with the FSB because "all our reasonably savvy customers use VPN," which obscures users' true IP addresses, "and do not provide their real email addresses." GX 346, at 4.

In short, the Court can reasonably draw the same inference that the defendant himself drew: that Scan4you's users were predominately, if not exclusively, hackers and, if they were at all "savvy," would have been cautious enough to obscure their true email addresses and locations. This inference follows from the fact that the defendant designed Scan4you for hackers and advertised exclusively on hacking forums and from the fact that Scan4you was widely considered to be a criminal service by both the cybersecurity community and the hacking community. Indeed, it is hard to even imagine how a potential customer could learn about Scan4you in the first place without simultaneously learning its criminal nature, given that Scan4you's web presence consisted solely of ads on hacking forums and articles in cybersecurity publications declaring it a criminal service.

But if a legitimate user did somehow stumble upon Scan4you without first learning of its criminal nature, the Scan4you website itself would educate the user about the site's criminality. The top of Scan4you's website displayed large banners advertising criminal services such as ransomware and crypters. *See*, *e.g.*, GX 46. And the middle of the website gave repeated assurances that Scan4you did not cooperate with antivirus companies, *see* GX 54, thus making it clear that Scan4you was pirating the services of those antivirus companies without their permission.

The defendant's retained expert, Heather Shannon, testified that a legitimate person "might have privacy concerns with uploading something from your computer to share it with Google [which owned VirusTotal] and the large community of subscribers to VirusTotal." Trial Tr. 819. As an initial matter, Shannon's privacy concerns for VirusTotal are overstated. VirusTotal remains an industry standard in the cybersecurity industry for testing potentially malicious files, *see* 787-88 (expert testimony of Symantec's Vikram Thakur); indeed, even Shannon herself testified that she used VirusTotal as part of her research into the malware used in the Target attack, *see* Trial Tr. at 820 (Shannon testimony) (Q. What do you typically do when you just have a hash to learn more about the file? A. … ***Probably look it up on VirusTotal***") (emphasis added). Moreover, Shannon's suggestion that VirusTotal allows users to "download files that have been uploaded to VirusTotal," *see* Trial Tr. 818, is inconsistent with VirusTotal's own representations. According to the Privacy Policy posted on VirusTotal's website, VirusTotal only shares the "raw data underlying" suspicious files submitted to it with a select group of "security partners" in the "anti-malware and security industry … [that are] bound by contract to only use the Samples for internal security purposes … [and] to detect malicious code and to improve their antivirus engines" and "a select group of security actors all of whom we have verified are engaged in active threat-detection and prevention activities."[4]

In any event, Shannon never suggested that privacy-minded users would prefer Scan4you over VirusTotal, only that "there are [noncriminal] reasons why someone would not want their files shared" with antivirus companies. Trial Tr. 818-19. So even if Shannon is right that there might be a market for a private malware-checking site, the defendant acted in ways that were

[4] *Privacy Policy*, VirusTotal, https://support.virustotal.com/hc/en-us/articles/115002168385-Privacy-Policy.

antithetical to attracting such users. The two examples of potential legitimate users that Shannon imagined were someone who develops their own malware for research purposes and a data breach victim who is concerned that the malware used against them "might be customized in ways that can reveal user names, passwords, [and] specific details about your network." Trial. Tr. 819. It makes no sense to suggest that such individuals would be concerned about sharing such sensitive information with Google, but would be totally fine with providing it to a website like Scan4you that explicitly advertised itself as a criminal website and that advertised ransomware on its own site. It is unreasonable to believe that the defendant somehow amassed thousands of legitimate users ***by accident***, despite his best efforts to seek criminal users and to cultivate a criminal reputation. The far more reasonable inference is that the defendant's 30,000 clients were precisely the clients that he worked so hard to attract: hackers and developers of malicious software.

### C. At Trial, the Government Proved That Crimes Were Aided and Abetted by Scan4you.

Despite the above-summarized evidence indicating that Scan4you aided and abetted thousands of computer hackers, the government has cautiously limited its loss calculation to just the data breaches conducted with three particular Scan4you-tested malware. The relationship between these malware and Scan4you was proven at trial with overwhelming evidence.

#### 1. Limitless Keylogger

Zachary Shames pled guilty to computer intrusions for designing a malware toolkit called the Limitless Keylogger that was used to infect 16,847 computers and steal sensitive information such as email and banking passwords. PSR ¶¶ 7, 33, 42. Shames testified that Scan4you assisted with all intrusions committed with Limitless in two ways. First, Shames himself used Scan4you to repeatedly test and edit Limitless—a process that eventually led to Limitless reducing its

detections rate to zero.[5] This testimony was corroborated by Shames's account on Scan4you, which was highly consistent with this iterative process. A summary of Shames's Scan4you account (GX 199) shows three files with the names: LimitlessLogger.exe, Limitlesspdf.exe, and Limit.exe. Each file is scanned repeatedly, each new scan shows a different hash value but the same file name, and with each scan the number of detections generally decreases (from 5 to 1, 7 to 2, and 9 to 1, respectively). *See* GX 199. Because these Scan4you-aided detection reductions occurred between November 2012 and January 2013, *see* GX 199, and the 16,847 Limitless infections upon which the government relies began in February 2013 at the earliest,[6] all of those infections were aided by Scan4you. Second, Shames integrated Scan4you into Limitless and encouraged his customers to use Scan4you before deploying the malware.[7] Shames further

---

[5] *See* Trial Tr. 117 ("Q. When you first created Limitless in 2011 and 2012, was Limitless detectable to antivirus companies? A. Yes. … Did [your] customers ever complain to you that your Limitless was detectable? A. Yes. … Q. Could you describe the process you went through to reduce the detectability of Limitless? A. I would edit some code, and then I would upload it to **Scan4you** and have it scanned back to see which antiviruses detected it. Then I would kind of rinse and repeat that process until it was undetectable.") (emphasis added). Ultimately, Shames was able to reduce Limitless's detectability to zero—a fact that he proudly announce in a video that showed him testing Limitless with Scan4you and Scan4you providing a fully-clean report. *See* Trial Tr. 121; GX 355.

[6] The 16,847 Limitless infections are based on data obtained from Shames's cloud storage account with Hostgator. *See* Trial Tr. 491-92 (Kim testimony). According to subscriber information obtain from Hostgator, Shames did not even open that account until February 23, 2013. *See* GX 202.

[7] GX 190 (YouTube Video in which Shames strongly advises his users to use the built-in Scan4you feature); Trial Tr. 129 ("Q. At the beginning of the video, why was your voice so animated when you said, 'Do not scan on VirusTotal'? A. Because if you scan on VirusTotal, then the files would get detected faster."); Trial Tr. at 124 ("Q. So if you had already checked Limitless and found it was undetectable, why would you check it again through Scan4you right before using it? A. Because over time, antiviruses will start picking up on it, and the same scan won't yield the same results later on."). Shames's integration of Scan4you into Limitless appears to have occurred at least as early as November 2012 since the YouTube video showing the integration appears to have been made at that time based on the dates in the "news feed" shown on the video. *See* GX 190, at 28 second mark.

testified that he knew his customers used the integrated Scan4you feature because Scan4you charged him for his customers' scans and because customers would send him screenshots of the Scan4you results to complain if Scan4you showed detections. *See* Trial Tr. 128.

**2. Citadel Banking Trojan**

At trial, the government offered the testimony of former Special Agent Mark Ray, who investigated the Citadel banking Trojan and testified that it was a widely-used malware designed to steal financial information from victim computers. *See* Trial Tr. 156. The government introduced screenshots from a version of Citadel which showed that Scan4you had been integrated directly into Citadel's toolkit. *See* GX 156(b). The government also offered testimony from Mark Vartanyan, who pled guilty to assisting with the development of Citadel and testified that he personally integrated Scan4you into Citadel. *See* Trial Tr. 209, 213-216. Finally, the government offered testimony from Dmitry Belorossov, who pled guilty for using Citadel to infect computers and steal financial information. PSR ¶ 9. Belorossov testified that he personally used Citadel to infect over 10,000 computers, Trial Tr. 235, that he used the information he stole from those computers to commit fraud, *id*. at 234, 253, that he "always" used a scanning service before deploying malware, *id.* at 241, and that with Citadel his scanning service was Scan4you, *id*.

The government was able to show that Scan4you had been integrated into Citadel since at least March 2012. Citadel released new versions from time to time and described the new features of each version on an online forum accessible to purchasers of the malware. *See* GX 155A-155B (Citadel forum posts discussing Citadel updates). In March 2012, Citadel's developers released version 1.3.3.5 of the malware, and boasted on that forum that "We have integrated with the service Scan4you, so with one click you can now check all of your exe builds for their security risks in the Citadel admin." GX 154(b). The forum added that "You can also have your files automatically

checked [through Scan4you] once a day, and if one of your files is being detected by more than three antiviruses then you will quickly receive a notification to your Jabber so you can immediately replace the exe. The mechanism will now work automatically … so go ahead and be lazy!" *Id.* Mark Vartanyan testified that this periodic check function allowed Citadel's users to test their files through Scan4you every day so that, as soon as Citadel was detected by antivirus companies, the hackers could re-crypt and re-infect the victims before they lost access to their bots. *See* Trial Tr. 213-216. Citadel was in operation until at least October 2016. *See* Ex. A (Decl. of Vishant Patel, Microsoft Digital Crimes Unit).

**3. Target Data Breach**

Finally, the government proved that Scan4you was used to test some of the malware used in the attack on Target Stores in 2013 that compromised over 39 million credit and debit card numbers. At trial, the government presented extensive evidence that five of these malware files were tested (and two were honed) with Scan4you before being deployed against Target.[8] Dan Ryan, a network forensics expert who was part of the team from Verizon who investigated the Target breach, testified that the five files scanned by Profile 958 were likely part of the "recognizance" phase of the Target breach. Trial Tr. at 276. Networks of large companies like Target have multiple layers of security—different parts of the network require additional passwords, and payment information is stored in a segmented fashion to make it hard to find and exfiltrate valuable data. *Id.* at 274. Thus, once inside such a network, hackers need to steal additional passwords and determine where and how financial information is stored. *Id.* at 274, 277. The five Scan4you files did just that. *See, e.g.*, *id.* at 274 (Ryan Testimony) ("So this tool

[8] The government will provide details in a separate filing.

would allow a hacker to get usernames and passwords from that system and then leverage those usernames and passwords to move to other systems inside the Target network"). Defense expert Heather Shannon correctly pointed out that the five Scan4you files were not used to actually gather and exfiltrate payment information from Target; rather, she testified, that job was done by malware that was "highly customized" to Target's system. *Id.* at 829. Shannon admitted, however, that malware that gathers information on where payment information is stored, such as the malware that Profile 958 scanned through Scan4you, "would be helpful in creating … custom malware" like that used against Target.[9] Shannon also concede that the recognizance phrase "can be an important part of a data breach." *Id.* at 830.

## II. Additional Crimes Committed by the Defendant

Scan4you was hardly the defendant's only criminal scheme; in fact, his entire criminal history is difficult to document in just one sentencing memorandum. At trial, the government presented evidence that the defendant and Martisevs perpetrated a variety of hacking schemes from as early as 2007 and continuing until at least 2014. PSR ¶ 65. While most of these schemes were proven at trial and included in the presentence report, *see* PSR ¶¶ 66-70, the government adds some detail and context here. These details, while tedious, are important to underscore the

[9] *See* Trial Tr. at 829-30 (cross-examination of Heather Shannon) ("Q: In order to create custom malware to steal Target's payment information, the hacker would have to know information about Target's system, is that right? A. Yes. … Q. And this mtmp file, is that the type of malware that might give that information to a hacker? A. It would give them a hint what to look for. Q. All right. And the hint would be helpful in creating this custom malware which you said is the most important? A. That's right.").

defendant's long history of using his technological sophistication to develop new and innovative ways to victimize individuals and destabilize computer networks.

**A. Doorways/Click Redirection**

At trial, Martisevs described a scheme called "doorways" or "click redirection" in which he and the defendant used malicious software to redirect web traffic from legitimate to malicious websites. PSR ¶ 66. Although the government avoided unnecessary detail at trial, the defendant's methods of click redirection were quite sophisticated. In one instance, the defendant created a script that automatically searched for vulnerabilities in thousands of websites; once the defendant gained unauthorized access to a victim website, he would insert malicious code that would redirect the victim site's visitors to malicious sites. *See* 302 (Mar. 12, 2018 Interview), US-295922, at 2-3. In another instance, the defendant created viruses that would redirect infected computers to malicious websites of the defendant's choice. *Id.* at 1, 4. Martisevs's job was to install the viruses that the defendant created onto networks of infected computers ("botnets") that the pair had either infected themselves or rented from other criminals. *Id.* at. 1.

Beginning in approximately 2007, the defendant and Martisevs used doorways to redirect users to what Martisevs called "fake antivirus" sites. These sites would falsely inform the victim that his or her computer was infected with a virus and offer to sell the victim antivirus software that would remove the virus. At trial, Martisevs estimated that he and the defendant made approximately $30,000 to $40,000 from this scheme. Trial Tr. at 719. Martisevs's testimony on this point was corroborated by his "Skype" chats with the defendant, which repeatedly reference "doorways." *See, e.g.*, GX 32, at 8.

Redirection to these fake antivirus sites appears to be just one example of the malicious sites to which the defendant redirected victims. Rather, the defendant and Martisevs regularly

conducted click redirection on behalf of cybercrime "affiliate programs." *See* 302 (Mar. 12, 2018 Interview), at 2. In short, "the task of the 'affiliates,'" in this case the defendant and Martisevs, "is to generate as many successful malware infections as possible. In return, the owners of the affiliate program share the income received as a result of these infections with the affiliates." *Russian Financial Cybercrime: How It Works*, Kaspersky Lab (Nov. 19, 2015). For example, the defendant and Martisevs discussed creating "doorway for Eva" over Skype. GX 32, at 31. "Eva" refers to EvaPharmacy, a Russia-based company that the FDA has publically stated sells misbranded and unapproved pharmaceuticals online. *See* Ex. B (Cease and Desist Letter from FDA to EvaPharmacy (June. 26, 2013)).

**B. Hacking Tens of Thousands of Computers in the United States**

Throughout the Skype chats within Government's Exhibit 32, the defendant and Martisevs repeatedly discussed plans to use "exploits," in order to obtain "bots" or "rabbits." According to the testimony of multiple expert witnesses and Martisevs himself, "exploits" are malware designed to gain control of a victim computer and "bots" and "rabbits" are infected computers. *See, e.g.*, Trial. Tr. at 731, 736-37 (Martisevs testimony). Based on the Skype chats, the defendant and Martisevs appear to have hacked computers for years and compromised tens of thousands of computers in the United States. The defendant's role was to create or obtain exploits and other malware, as well as to crypt the malware to avoid detection by antivirus software. *See* PSR ¶ 67. The chart below provides excerpts and summaries of some of the Skype communications within the government's trial exhibit that reference these hacking schemes. *See* GX 32. At trial, Martisevs confirmed that these chats did indeed refer to hacking schemes that he conducted with the defendant.

| Page | Date | Summary/Excerpts of Communication From GX 32 |
|---|---|---|
| 1 | 7/13/2007 | **Bondars:** "I am thinking of finding a useful idiot, hack him, and dump it all on him." |
| 5 | 8/1/2007 | **Bondars** described a particular type of malware, noting that it "infects and spreads on its own, without hacker's assistance" and announcing that "this is what I am trying to launch." **Bondars** further stated that his malware would allow him to "control[] their computer," and steal email passwords and personal files and photographs. |
| 8 | 12/7/2007 | **Bondars** stated his intention to disseminate an "exploit" "strictly in the U.S.A." in order to obtain "moneymaking bots." |
| 8-9 | 1/10/2008 | **Martisevs:** "how many rabbits do we have now?<br>**Bondars:** "somewhere around 12k permanent ones and about 5k random users, those who either rarely use the internet, or about to leave soon." |
| 11 | 1/23/2008 | **Bondars:** "I will re-write the crypting scheme soon" |
| 13-14 | 2/1/2008 | **Bondars** bragged that "I can create software that will be impossible to remove from the rabbit's machine," before asking Martisevs to "send the exploit" that he wanted crypted. Martisevs then sent a link to an exploit called "milworm." |
| 16 | 3/27/2008–4/8/2008 | **Martisevs** repeatedly asked Bondars to crypt exploits and **Bondars** either complied or explained that particular exploits could not be crypted. |
| 16 | 7/14/2008 | **Martisevs:** "Can you give me an approximate number of rabbits we have online per day?"<br>**Bondars:** "We had 15k yesterday, it is usually less on weekends. Otherwise there are about 20k." |
| 21 | 9/17/2008 | **Bondars** told **Martisevs** that, for security reasons, "all hacking activities should be carried out from sub-domains" |
| 22 | 11/27/08 | **Bondars:** "I will crypt it in such a way that it won't get detected even in half a year," referring to malware they had been installing on infected computers, adding that "this is in order to trick the antivirus." |
| 25 | 12/9/2008 | **Martisevs:** "I am already able to walk inside victim's server" |
| 25 | 1/19/2009 | **Martisevs:** "we'll hack it now"<br>**Bondars:** "ok" |
| 25 | 1/29/2009 | **Martisevs:** "please create the exploit"<br>**Bondars:** "the exploit is done" |
| 33 | 2/22/2012 | **Bondars** sent a link to Scan4you results and told **Martisevs** "so far, this is the result. The file is not being detected." |

### C. Extortion and Ransomware

In his Skype chats with Martisevs, the defendant repeatedly suggested that the two blackmail their hacking victims. On August 1, 2007, for instance, the defendant explained how the malware he is deploying would allow him to "control [the victims'] computer." GX 32, at

5. The defendant then suggested stealing sensitive personal photographs in order to blackmail victims: "we can do anything we want … even stealing personal photos…. Many will be ready to give up a lot in order to keep their photos from winding up on the internet ☺." *Id.* Martisevs responded, "☺ this is terrible, basically this is blackmail ☺," to which the defendant replied "right." *Id.* Months later, on January 24, 2008, the defendant sent Martisevs a link to a post on a known cybercrime forum discussing how to use ransomware. Ransomware, which was then a new innovation, is a type of malware that encrypts or "locks" a victim's files and then demands that the victim pay to unlock his own files. Along with this link, the defendant told Martisevs: "we can do something like this … we can ask $10 simply for removing our software." *Id.* at 13. Martisevs responded that "that would be blackmail," to which the defendant again responded, "right." *Id.* It is not known whether the defendant ever followed through on his plans to use ransomware and blackmail to monetize his computer hacking.

**D. Using of "SpyEye" Banking Trojan**

At trial, the government presented evidence that the defendant used a banking trojan called SpyEye to steal financial information from infected computers. Both Mark Ray, who led the investigation of SpyEye, and Robert McArdle, a Director of Forward Looking Treat Research at Trend Micro, testified that SpyEye was designed to steal financial information from a victim's computer and send it to "command and control" or "C2" servers used by hackers. PSR ¶ 69. McArdle testified that Trend Micro identified some C2 servers used by SpyEye by examining client computers infected with that malware and determining the servers to which the malware was programed to send stolen information. *Id.* Those C2 servers used the following sites: soundpong.com, sendspaper.com, sendspaper.net, bntx.net, and deep-sec-monitor.net. *See* GX 149. According to public WHOIS records, as well as confirmation emails found both on the

defendant's computer and in his email account, all of those websites were registered using the defendant's email address: b0rland7@gmail.com. *See* GX 150, 161-69.

**E. Bitcoin Mining Botnets**

By 2014, the defendant and Martisevs had moved on to more innovative ways of making money through computer hacking. One such scheme involved the use of malware called a "miner-bot." Bitcoin mining refers to the process of facilitating transactions in the virtual currency Bitcoin in exchange for a fee. Bitcoin mining is totally legal, but uses a tremendous amount of computer processing power and energy. *See* Stephanie Yang, *The Rise of Bitcoin Factories: Mining for the Masses*, WALL ST. J., Feb. 21, 2018. However, using botnets (infected computers) to mine bitcoins are not legal. A miner-bot allows a hacker to mine bitcoin using infected computers without the victim's knowledge or consent. As Martisevs explained to the defendant, the miner bot "is capable of mining any cryptocurrency" and works by "lauch[ing] from the infected machine's hard drives," it then "loads the desired miner, unzips it, hides it and discretely mines the currency." GX 14, at 16-17; GX 351, a 2. The defendant and Martisevs repeatedly discussed the need to "crypt" the miner bot in order to hide it from the antivirus software on the victims' computers. GX 14, at 14-17. At one point, Martisevs sent the defendant a link to Scan4you results, stating "definitely, it needs to be crypted." GX 14, at 15. On the same day that he sent the defendant a link to Scan4you results (2/4/2014), he scanned a file through Scan4you that at least six antivirus companies detected as a "BitCoinMiner." GX 144, at 18-19.

**F. Domain Generation Algorithm**

According to Martisevs, the defendant created domain generation algorithms ("DGA") to be used by other cybercriminals. *See* 302 (Mar. 12, 2018 Interview), at 4. A DGA is an automated processed designed to constantly shift the location of a malicious web domain in order to protect

a malicious service from being detected and blocked. *See* Manos Antonakakis et al., *Detecting the Rise of DGA-Based Malware*, USENIX Security Symposium, at 1-2 (Aug. 2012). The defendant reportedly worked with a Scan4you member who spread ransomware via malicious sites that falsely told victims that their Adobe software needed updating. Such websites quickly are blacklisted by antivirus sites. To combat this problem, the defendant created a DGA that automatically moved this malicious site to new domains after the existing domain was detected by antivirus companies. *See* 302 (Mar. 12, 2018 interview) at 4. According to Martisevs, the defendant subsequently made this script available to other Scan4you members who were requesting it. *Id.*

## III. Guidelines Range

The probation officer correctly calculated the defendant's offense level as follows:

| **Guideline** | **Offense Level** |
|---|---|
| Base Offense Level (Sections 2B1.1(a)(2)) | 7 |
| Loss amount exceeds $550 million (Section 2B1.1(b)(1)(P)) | +30 |
| The offense involved 10 or more victims (Section 2B1.1(b)(2)(A)(i)) | +2 |
| Substantial part of offense committed abroad (Section 2B1.1.(b)(10)) | +2 |
| Defendant was convicted of an offense under 18 U.S.C. § 1030 and the offense involved an intent to obtain personal information (Section 2B1.1.(b)(17)) | +2 |
| Defendant was convicted of an offense under 18 U.S.C.§1030(a)(5)(A) (Section 2B1.1(b)(18)(A)(ii)) | +4 |
| Defendant was an organizer or leader of a criminal activity that involved five or more participants (Section 3B1.1(a)) | +4 |
| **TOTAL** | **51** |

PSR ¶¶ 54-62. An offense level of 51 is literally off-the-charts and would ordinarily result in a guidelines of life imprisonment. However, the guidelines range is capped at the statutory maximum of 420 months. PSR ¶ 97.

### A. An Enhancement for Loss Amount Exceeding $550 Million Was Properly Assessed.

Probation calculated the losses attributable to the defendant as $20,503,369,400. PSR ¶ 44. This loss is based on the defendant's role in aiding the Target data breach and the computer intrusions conducted with the Limitless Logger and the Citadel Banking Trojan. With the exception of some minor corrections noted below, the probation officer's calculations were correct (in fact, the Citadel loss estimates were likely excessively conservative, based on current knowledge of its harms):

- **Target Data Breach:** The Target data breach compromised at least 39,292,617 credit and debit card numbers. *See* Trial Tr. 266 (Ryan testimony); US-295251 (Verizon Final Incident Report to Target Corporation).[10] Under the guidelines, the loss associated with each stolen access device "shall be not less than $500 per access device." U.S.S.G. § 2B1.1, app. note 3(F) (i). Accordingly, the loss associate with the Target data breach for guidelines purposes is **$19,646,308,500**.[11]

- **Limitless Keylogger:** Probation determined that the provable loss attributable to Limitless is $3,369,400. PSR ¶ 42. This is the same loss amount the Court attributed to Limitless at the sentencings of Zachary Shames and Taylor Huddleston. *Id.*[12] The figure was based on the 16,847 computer intrusions committed with Limitless, *see* GX 188-89, multiplied by the cost of repairing a computer infected with malware like the Limitless Logger. The government estimated that cost to be $200 per computer based on information the FBI

[10] Probation attributed 40 million compromised payment cards to the Target Breach which is based on estimates proved by the government. The government now recommends using the more conservative figure of 39,292,617.

[11] While this loss figure is based on the statutory presumption that each compromised payment card caused at least $500 in fraud losses, there is also evidence that the Target breach led to real fraud against its very real victims. *See* Brian Krebs, *Cards Stolen in Target Breach Flood Underground Markets*, Krebs on Security (Dec. 20, 2013). Moreover, the $19,646,308,500 loss figure does not even consider all the well-documented losses that Target itself suffered as a result of the breach, which are also properly considered under the guidelines. *See* U.S.S.G. § 2B1.1, note 3(A)(v)(III)

[12] As noted by probation, Shames was only held accountable for $606,400 of these losses because that was the estimated amount committed with versions of Limitless sold before Shames reached the age of 18. PSR ¶ 42. Huddleston, however, was held accountable for the entire $3,369,400 for his role in aiding the distribution of the Limitless Logger. *Id.*

received from four private computer service companies that offer malware remediation services and provided to probation. *See* Ex. C (Decl. of FBI Special Agent Amanda Fritz). The estimate includes the cost of backing up personal files from the infected computer, wiping the computer's hard drive, and then reinstalling the computer's operating system. *Id.* Consideration of such costs is appropriate under the guidelines, which counsel that loss amount for computer intrusions should include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense." U.S.S.G. § 2B1.1, note 3(A)(v)(III); *accord* 18 U.S.C. § 1030(e)(11). Probation's loss figure of **$3,369,400** represents the number of computers infected with the Limitless Keylogger (16,847) multiplied by the cost of repairing each of those computers ($200).

- **Citadel Banking Trojan:** In their plea agreements, Vartanyan and Belorossov stipulated that $500 million in losses caused by Citadel overall, based on an estimation of 11 million infections, which was a figure grounded in industry estimates at the time. PSR ¶ 43. The sentencing court in the Northern District of Georgia adopted that loss figure. However, more recent information obtained from Microsoft indicates that between 2013 and 2016, Citadel infected approximately 33 million unique IP addresses. *See* Ex. A (Microsoft Decl.).[13] Because there can be multiple devices connected to any IP address at any point in time, a conservative estimate of devices infected during this period is 33 million. Using the same above-discussed estimate of $200 to fix each computer, that is equivalent to approximately **$6.6 billion** in damage to those computers.

The losses sustained as a result of the Target breach and the Limitless and Citadel malware are properly attributable to the defendant under two independent guideline provisions. Section 1B1.3 of the guidelines provide that the specific offense characteristics "shall be determined on the basis of the following: (1)(A) all acts and omissions committed, aided, abetted, counseled,

[13] In 2013, Microsoft's Digital Crimes Unit worked with law enforcement in the U.S. and overseas to shut down servers in the United States that were operating as "command and control" ("C2") servers directing the malicious activities of bots infected with Citadel malware. Jim Finkle, *Microsoft Says It Freed Millions of Computers from Criminal Botnet*, REUTERS, Jun. 18, 2013, *available at* https://www.reuters.com/article/net-us-citadel-botnet/microsoft-says-it-freed-millions-of-computers-from-criminal-botnet-idUSBRE95H1EG20130618. Microsoft obtained court authorization to take down some of these servers, then replace them with ones Microsoft operated, which allowed security researchers to analyze the number of infected computers attempting to call out to, or connect with, their C2 servers. Richard Boscovich, *Initial Revelations and Results of the Citadel Botnet Operation*, MICROSOFT TECHNET (June 21, 2013), https://blogs.technet.microsoft.com/microsoft_on_the_issues/2013/06/21/initial-revelations-and-results-of-the-citadel-botnet-operation/. This process is described in more detail in Microsoft's affidavit. *See* Ex. A.

commanded, induced, procured, or willfully caused by the defendant; ***and*** (B) … all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (3) reasonably foreseeable in connection with that criminal activity." U.S.S.G. 1B1.3(a)(1)(A) and (B). The guidelines repeatedly stress that these are independent bases for attributing harm to the defendant. *See, e.g.*, U.S.S.G. 1B1.3, app. note 2 ("If a defendant's accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions"); *id.* note 3(D) ("The requirement of foreseeability applies only in respect to conduct … of others under (a)(1)(B)," not to "conduct that the defendant … aids [and] abets … under subsection (a)(1)(A)").

The defendant is responsible for the Target, Citadel, and Limitless intrusions under 1B1.3(a)(1)(A) because, as the government demonstrated at trial, he aided and abetted those crimes. The defendant's assertions to the contrary all rely on the dubious premise that a defendant cannot be guilty of aiding and abetting so long as he avoids learning the time, place, target, or other details of the crime he aids. As the Court correctly instructed the jury, that is not the law. *See* Trial Tr. 918-19. Similarly, the defendant's efforts to minimize the extent to which Scan4you aided these crimes is wrong as a matter of evidence, *see supra* Section 1.C, and irrelevant as a matter of law since "courts have never thought relevant the importance of the aid rendered." *Rosemond v. United States*, 134 S. Ct. 1240, 1246–47 (2014).

The defendant is also accountable for the Target, Citadel, and Limitless intrusions under subsection (a)(1)(B) because these intrusions were committed within the scope of his jointly undertaken criminal activity, in furtherance of that activity, and was reasonably foreseeable. At trial, the government presented extensive evidence that the defendant operated Scan4you with the intent that it be used to further hacking and fraud schemes; therefore, when Scan4you members

used it for that intended purpose, such conduct is "within the scope" of the criminal activity in which the defendant agreed to participate. Similarly, when Profile 958 tested malware through Scan4you before using it to hack Target, or when Shames used Scan4you to reduce Limitless's detectability, or when Vartanyan and Shames integrated Scan4you's API tool into Citadel and Limitless, respectively, they were all acting in furtherance of the criminal activity (computer intrusions and wire fraud) that the defendant agreed to jointly undertake.

The losses caused by the Target, Citadel, and Limitless intrusions, while massive, were easily foreseeable to the defendant. He spent eight years building the largest counter-antivirus service on the internet, amassing 30,000 members solely through ads on criminal hacking forums. He knew that his service was ranked the number one counter-antivirus service by the notorious criminal forum "FuckAV.ru," Trial Tr. 730-31 (Martisevs testimony), and that *Krebs on Security* and *Digital Shadows* had called Scan4you the largest and best known counter antivirus service on the web, *see* GX 22. The defendant, better than anyone, knew that he was providing an "essential" service that every hacker needed. As a hacker himself who infected tens of thousands of computers, the defendant was well aware of the fact that any one of his thousands of hacker-members could cause massive losses with just one successful hack. Because the defendant knew that he had the dominate market possession in providing an essential service to hackers around the world, he must have known that the combined harm of his thousands of clients was astronomical. Thus, a statutory loss figure exceeding $20 billion, while astronomical, was reasonably foreseeable to the defendant.[14]

---

[14] If the Court were to accept the defendant's invitation to substitute Scan4you's revenues for the loss amount, that would still require at least a 14-point enhancement for loss exceeding $550,000. Scan4you accepted payment from clients via the following methods: PayPal, Bitcoin, Webmoney, Paxum and Liberty Reserve. Trial Tr. 728 (Martisevs testimony); GX 1, at 4 (defendant statement). The government was able to obtain records from PayPal indicating that Scan4you

### B. The Enhancements for 10 or More Victims and for Intent to Obtain Personal Information Were Properly-Assessed.

The defendant's objections to the enhancements for the offense involving over ten victims under Section 2B1.1(b)(2)(A)(i), and involving an intent to obtain personal information under Section 2B1.1(b)(17), fail for the same reason: offense characteristics are determined based on the acts the defendant aided and abetted under 1B1.3(a)(1)(A), and by the acts of others that were within the scope of and in furtherance of reasonably foreseeable jointly undertaken criminal activity under 1B1.3(a)(1)(B). Because the defendant aided and abetted the Target, Limitless, and Citadel computer intrusions, and because those intrusions involved over ten victims and an intent to obtain personal information, those enhancements are appropriate under subsection (a)(1)(A).

---

received $125,769.87 in payments from customers over that platform. The government also obtained bitcoin records from the defendant's computer indicating that Scan4you receive payment of 242.7718 bitcoin. *See* Decl. of SA Gerald Kim, Dkt. No. 199-1. Since each bitcoin is currently worth $6,261.26, those payments are now worth approximately $1.52 million. However, as of April 27, 2017, the approximate time that the defendant's bitcoin wallet was seized by Latvian police, one bitcoin was worth approximately $1,335.56. *See Bitcoin Price Passes $1400 to Hit Highest Value in History*, Coindesk (May 1, 2017). Thus, Scan4you's bitcoin proceeds were worth approximately $324,236 at the time of seizure. The government's ability to obtain records of payments Scan4you received via WebMoney, Paxum, and Liberty Reserve is limited because the former two are foreign companies (Russian and Canadian, respectively), and the latter was a criminal organization. *See* U.S. Dep't of Justice, *Liberty Reserve Founder Arthur Budovsky Sentenced In Manhattan Federal Court To 20 Years For Laundering Hundreds Of Millions Of Dollars Through His Global Digital Currency* (May. 6, 2016). There are other ways to estimate Scan4you's revenue, however. The defendant himself stated that Scan4you's profits were on average 4,000 per month. *See* GX 1, at 4. Assuming that Scan4you incurred even $500/month in expenses (for things like advertising and renting server space), its average monthly revenue would be $4500. Scan4you operated from October 2009 through April 2017; therefore, a reasonable estimate of proceeds based on the defendant's own statement is **$409,500** ($4500 x 91 months). But, of course, the defendant has an incentive to minimize his criminal proceeds. So another way to estimate Scan4you's total revenue is to multiple the 14.2 million scans conducted on Scan4you, *see* Trial Tr. 838 (Peden Testimony), by the cost of $.15/scan, which comes to $2.13 million. That number is admittedly inflated, however, since presumably some of Scan4you's users paid the monthly option of $25/month and scanned enough to bring their rate per scan down to less than $.15/scan. Still, even assuming an actual revenue per scan of just 5 cents, this still results in a conservative estimate of **$710,000 criminal receipts** during the life of Scan4you.

Those enhancements are also appropriate under subsection (a)(1)(B) because they were within the scope of and in furtherance of reasonably foreseeable jointly undertaken criminal activity.

**C. The Enhancement for Leadership Role Was Properly Assessed.**

Finally, the probation officer appropriately applied a four-point leadership enhancement. PSR ¶ 47. By his own admission, the defendant designed and operated Scan4you's sophisticated technical infrastructure. *See* GX 1, 3. Although Martisevs played a leadership role in his own right, he did not have the technical ability to create and maintain a sophisticated tool like Scan4you. *See* Trial Tr. 712, 724-25. Moreover, the defendant admitted to creating Scan4you's API feature, *see* GX 3, at 4, 6, which Shames and Vartanyan integrated into Limitless and Citadel, and which ultimately gave malicious actors all over the world access to Scan4you. While it is true that the thousands of hackers and malware developers who became Scan4you members would have existed without the defendant, the defendant brought them together and added a level of sophistication and mutual support that they would not otherwise have had. Indeed, as Trend Micro's Chief Cybersecurity Officer explained, Scan4you was "special" in "the scale and scope of crime as a service"; Scan4you was "selling the ability to make other criminal campaigns much more successful," which "speaks to the level of capability of the criminal underground." *See* Lily Hay Newman, *Inside the Takedown of a Notorious Malware Clearinghouse*, WIRED (May 16, 2018). The increased danger associated with that type of organization and cooperation among criminals is precisely the reason for the leadership enhancement.[15]

[15] The probation officer appropriately omitted an enhancement for use of a special skill under Section 3B1.3 because that enhancement may not be applied in addition to a leadership role enhancement. *See* U.S.S.G. § 3B1.3. If the Court were to forgo a leadership enhancement, however, a special skill enhancement would be appropriate since this crime would not have been possible without the defendant's extraordinary technical skills.

## IV. Section 3553(a) Factors

As the Court is well aware, the Sentencing Guidelines are advisory, and just one factor that must be considered along with the other factors set forth in 18 U.S.C. § 3553(a).[16] Here, however, a guidelines sentence is also supported by the 3553(a) factors, particularly the need for a sentence that reflects the extraordinary harm caused by Scan4you, protects the public from a sophisticated and unrepentant hacker, and deters foreign-based computer hackers like the defendant who believe they can victimize Americans online with impunity.

### A. The Sentence Should Reflect the Defendant's Significant Contribution to Global Computer Hacking.

The full harm caused by Scan4you is almost immeasurable. As demonstrated at trial, counter-antiviruses are "essential" to computer hacking and utilized by any hacker with any level of sophistication. *See supra* pp. 3-4. For eight years, the defendant ran the largest counter-antivirus service in the world with thousands of criminal members. The $20 billion loss amount, while large, only represents the harm associated with a few of the defendant's thousands of criminal clients. According to Ed Cabrera, the chief cybersecurity officer at one of the world's largest antivirus companies, "Scan4You gives a leg up [to] criminals" and "was a critical tool" that allowed hacking "campaigns to be successful globally." *See Inside the Takedown of a Notorious Malware Clearinghouse*, WIRED (May 16, 2018). Cabrera added that "you see the impact when

---

[16] The § 3553(a) factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed training, medical care, or other treatment; the kinds of sentences available; the kinds of sentence and the sentencing range established for the type of offense committed; any pertinent policy statement; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

you take down one of these key individuals or groups. There's a ripple effect." *Id.* As Mark Ray testified at trial, "there's the constant back-and-forth between the cybercriminals and antivirus companies trying to keep up with each other." Trial Tr. at 174. For eight years, the defendant intentionally gave hackers all over the world a leg up in that competition.

Computer hacking costs the U.S. economy tens, if not hundreds, of billions of dollars a year. *See* The Counsel of Economic Advisors, *The Cost of Malicious Cyber Activity to the U.S. Economy*, at 36 (Feb. 2018) (estimating that computer hacking cost the U.S. economy between $57 to 109 billion in 2016); *Study: Hackers Cost More Than $445 Billion Annually*, U.S. NEWS & WORLD REPORT (June 9, 2014). As the architect of Scan4you, and a major developer of the very idea of a counter-antivirus service, the defendant's contribution to global cybercrime cannot be overstated. His sentence should reflect his outsized role in supporting global cybercrime.

### B. The Sentence Should Protect the American Pubic from the Defendant's Future Crimes.

Since at least 2007, the defendant engaged in a wide variety of computer-related crimes. He is an extremely sophisticated and talented hacker and his crimes display a troubling degree of organization and innovation. As demonstrated in Section II above, the defendant created viruses, crypted malware, wrote scripts that crawled the web searching for vulnerabilities in websites, hacked tens of thousands of computers, utilized a banking trojan that targets financial information, and developed domain generation algorithms to keep ransomware users one-step-ahead of antivirus companies. This was all before his crowning achievement which was to design a scanning service that would become the industry standard in the hacking community. Indeed, the FBI forensic investigators who examined the Scan4you infrastructure that the defendant created were amazed by its sophistication. Even more recently, the defendant deployed malware designed

to mine bitcoin using infected computers, *see supra* Section II.E, another example of the increasing innovation and sophistication of his crimes.

In the seventeen months since his arrest, the defendant has shown no remorse, no acceptance of responsibility, and no desire to make amends for crimes. Upon his release from prison, he will likely return to Latvia where he will have no probation officer and where U.S. law enforcement will have limited ability to monitor his actions. Given his track record, it is hard to imagine a scenario in which he would not go right back to using his considerable computer skills to victimize Americans. In this sense, the defendant is different from Taylor Huddleston, Zachary Shames, and other domestic and repentant cybercriminals. Unlike those individuals, the defendant represents a significant future threat to the data security of American businesses and individuals. His sentence should consider the rights of his future victims.

### C. The Sentence Should Deter Organized Computer Hacking.

Computer hacking is highly-organized thanks in large part to people like the defendant who created a business designed to serve the needs of hackers. Few hackers act alone. They rely on malware created by others; they obscure the malware using crypters created by others; and they test the malware using a counter-antivirus service created by others. Indeed, many (perhaps most) hackers do not have the technical skill build all the malicious tools that they use. If the United States is serious about combating computer hacking, it cannot be afraid to take on the organized services that exist to give hackers critical support.

Computer hacking and those who support them often live beyond U.S. borders and use sophisticated means to avoid detection and apprehension. These individuals believe that their chances of facing real consequences for their actions pale in comparison with the easy money to be made. The defendant himself appears to have had this attitude: in 2008, he told Martisevs that

"what you and I are doing is quite illegal," yet reasoned that they could avoid responsibility even if they were caught by claiming "we were hacked by some nefarious Russian hacker." GX 32, at 17. The defendant continued his crimes even after learning that Scan4you was being investigated by the United States in 2013 and even after his co-conspirator was arrested in the United Kingdom in 2015.

The defendant was right in one sense: it can take years to build a hacking case and even longer for a foreign-based offender to be arrested and extradited; meanwhile, the financial benefits of cybercrime can be immediate and immense. It is therefore unsurprising that foreign cybercriminals like the defendant calculate that the benefits of the crime outweigh the potential sanction when discounted by the low likelihood that the sanction will ever occur.

This case needs to serve as a counter-example. It should send a message that criminal hackers and those who provide them critical support will be held accountable, wherever they live. This Court should deliver a sanction that is severe enough to deter even criminals living half a world away.

## V. Conclusion

For the foregoing reasons, the government respectfully recommends a sentence of **420 months' imprisonment**.

G. Zachary Terwilliger
United States Attorney

By: /s/
Kellen S. Dwyer
Laura Fong
Assistant United States Attorneys
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
kellen.dwyer@usdoj.gov

C. Alden Pelker
Trial Attorney
Computer Crime and Intellectual Property Section
U.S. Department of Justice, Criminal Division

September 14, 2018

## Certificate of Service

I hereby certify that on this day, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of filing (NEF) to counsel of record for the defense.

I also certify that on this day, I will send a true and correct copy of the foregoing by e-mail to the following:

Kelly M. Smihal
United States Probation Officer
Kelly_smihal@vaep.uscourts.gov

By: /s/

Laura Fong
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
laura.fong@usdoj.gov